IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>JOHN KILGALLON, DANIEL C. MOSTELLER, AND STEPHEN HOUGHTALING,<br><br>                    Defendants. | **1:21-CR-10023**<br><br>**MEMORANDUM AND ORDER** |

## I.    INTRODUCTION

This case involves the prosecution of John Kilgallon, Chief of Staff of the United States Marshals Service ("USMS"); Daniel Mosteller, United States Marshal for the District of South Dakota; and Stephen Houghtaling, Chief Deputy United States Marshal for the District of South Dakota, on charges of criminal contempt of court. The matter comes before the Court on Defendants' Motion to Dismiss the charges against them. Filing 45.

The charges were initiated by the Honorable Charles B. Kornmann, Senior United States District Judge for the District of South Dakota, after an incident in his courtroom on May 10, 2021, when a member of the USMS refused to tell him whether she was vaccinated against COVID-19. Filing 21. Subsequent to that incident, the USMS, in consultation with the named defendants in this case and without permission of the Court, removed three prisoners that Judge Kornmann had ordered be made available the same day or the following day for criminal hearings. Judge Kornmann then cited the three defendants for criminal contempt for ordering or allowing the removal of the prisoners from the courthouse without permission of the Court.

The USMS is an executive-branch agency that is obligated "to obey, execute, and enforce all orders of the United States District Courts." 28 U.S.C. § 566(a). A major obligation of the USMS is to transport prisoners and make them available for hearings at the order of a United States District Judge or United States Magistrate Judge. *See id.* § 566(a)–(e) (describing USMS duties). The USMS is also obligated to provide security to federal judges. *See id.* § 566(a) ("It is the primary role and mission of the United States Marshals Service to provide for the security . . . of the United States District Courts . . . .").

The federal courts and the USMS have traditionally worked together harmoniously to ensure the safety and security of the federal courts. Disputes are rare and are normally resolved through discussion and compromise. In this case, however, the confrontation escalated and resulted in the present criminal-contempt charges. The United States District Court for the District of South Dakota made clear to the USMS that the Court, including Judge Kornmann, expected any United States Marshals who appeared in courtrooms in the district to be vaccinated for COVID-19. Despite the Court's clear and explicit instructions, the USMS for the District of South Dakota provided a U.S. Marshal in Judge Kornmann's courtroom who refused to state—due to USMS policy or otherwise—whether she was vaccinated. This act of defiance of the Court's instructions set up the dispute that led us here today. Subsequent to this incident, the President of the United States, pursuant to Executive Order 14043, has ordered that all U.S. Marshals be vaccinated for COVID-19.

This Court concludes the USMS, by directing its employees that they could refuse to state whether they were vaccinated for COVID-19 in a federal courtroom upon inquiry by a federal judge, and by removing prisoners ordered to be present for hearings without informing the presiding judge, acted in a manner unbecoming of the Service.

2

Although this Court believes the USMS failed in their duty to handle delicate matters like this with the grace and dignity expected of and normally displayed by the USMS, the question before the Court is not the good or poor judgment of the USMS but whether three members of the USMS must face a criminal trial over this incident. This Court concludes that the criminal contempt citation against the three defendants should be dismissed.

Judge Kornmann did not base his contempt charges on a failure to disclose vaccination status in his courtroom, nor did he hold the marshal who was in his courtroom that day in contempt. Rather, Judge Kornmann cited the defendants for ordering or allowing the removal of the prisoners despite his scheduled hearings. The marshals removed the prisoners from the Aberdeen courthouse after the USMS determined that they could not have at least one marshal in Judge Kornmann's judicial proceedings the day of the incident and the following day as required by long-standing policy. However, the USMS admittedly came to this conclusion based upon their flawed determination that they had no obligation to provide a marshal who was willing to disclose his or her vaccination status when appearing in a U.S. District Court courtroom proceeding when so directed by a federal judge.[1]

Although the USMS is obligated to obey Court orders such as those having incarcerated defendants present for hearing, 28 U.S.C. § 566(i) states that the USMS "retains final authority regarding security requirements for the judicial branch of the Federal Government." The USMS concluded they could not securely produce incarcerated persons for hearings in front of Judge Kornmann under the circumstances, given their internal policies and rules at the time. The defendants therefore cannot be tried for contempt of court on the charges levied.

---

[1] Although this Court concludes the USMS must provide a marshal willing to disclose his or her vaccination status if required by a federal judge in a federal courtroom proceeding, this Court does not address the question under consideration by federal courts around the country as to whether or under what circumstances employees of the federal government or other employers may be subject to a COVID-19 vaccination mandate.

3

Also before the Court is a motion filed by the Department of Justice asking the Court to "re-caption this case as 'In Re: Contempt' because the United States has declined to prosecute this matter," Filing 40; Filing 42, and the prosecution's Second Motion for Subpoenas Duces Tecum Pursuant To Rule 17(c), Filing 63. The Court held a hearing and heard arguments on the pending motions in Sioux Falls, South Dakota on October 25, 2021. For the reasons stated below, Defendants' Motion to Dismiss, Filing 45, is granted. The motion to recaption the case, Filing 40, is denied, and the motion for subpoenas, Filing 53, is denied as moot.

## II.   FACTUAL BACKGROUND

Judge Kornmann charged defendants Kilgallon, Mosteller, and Houghtaling with criminal contempt of court under 18 U.S.C. § 401(1) and (3), alleging they acted contemptuously on or about May 10, 2021,

> in concert and conspiracy . . . by ordering or allowing a deputy U.S. marshal, one of their subordinates, to remove three criminal defendants [scheduled for hearings before Judge Kornmann that day] . . . from [the] courthouse, without first notifying or asking permission from this Court and in violation of each defendant's scheduling order, causing said criminal defendants' hearings to be delayed, and thereby obstructing the administration of justice in those defendants' cases.

Filing 21 at 1. As discussed more fully below, the contempt charges arose after an incident in Judge Kornmann's courtroom on May 10, 2021, and the Marshals' subsequent removal of prisoners from the courthouse who were scheduled to appear in front of Judge Kornmann later that day and the next.

### A. The Court and the USMS Correspond Regarding COVID-19 Policies

On March 25, 2021, Judge Kornmann sent a memorandum to "[t]hose employed at the United States Courthouse, Aberdeen," carbon-copying other judges in the district, regarding the District of South Dakota's plan concerning COVID-19 precautions and vaccination. Filing 1-1. In his memorandum, Judge Kornmann stated that "[t]he first step is for me to inquire whether each

4

person working in the Aberdeen building has taken both vaccinations," and in the alternative, whether each worker had his or her vaccination scheduled. Filing 1-1. He also informed those employed at the Aberdeen courthouse that he "expect[ed] each person to reply in writing." Filing 1-1.

On April 13, 2021, court staff emailed Chief Deputy Houghtaling at Judge Kornmann's direction to let the USMS know Judge Kornmann was awaiting their response. Filing 11-2 at 2. On April 15, Marshal Mosteller responded to Judge Kornmann's memorandum, apologizing for the delay, and carbon-copying the other judges in the District of South Dakota. Filing 1-2. Marshal Mosteller's response assured Judge Kornmann that the USMS Judicial Security Division and its executive leadership were working with the Administrative Office of the United States Courts to address COVID-19 guidance at the national level. Filing 1-2. Marshal Mosteller's response went on to inform Judge Kornmann that "[g]iven the [Emergency Use Authorization] status of the [COVID-19] vaccination, the USMS is not requiring employees to be vaccinated, at this time." Filing 1-2. He further informed Judge Kornmann that "at this time, USMS employees will not be providing their respective vaccination status [sic] to the Court." Filing 1-2.

On May 4, 2021, the Honorable Roberto Lange, Chief Judge of the District of South Dakota, corresponded with defendant John Kilgallon, referencing Marshal Mosteller's response, and inquiring into USMS policies. Filing 1-5. Specifically, Chief Judge Lange asked Kilgallon "whether it is the policy of the U.S. Marshals Service not to know what Deputy U.S. Marshals are unvaccinated," and whether "the U.S. Marshals Service intends to have unvaccinated deputies work inside courtrooms where judges require all to be vaccinated." Filing 1-5 at 2. Chief Judge Lange also noted that "this Court likely will debar from chambers and courtrooms all its employees who refuse to be vaccinated. The district judges in South Dakota also want to avoid having

5

unvaccinated Deputy U.S. Marshals in the courtrooms." Filing 1-5 at 2. Marshal Mosteller, Chief Deputy Houghtaling, and the other judges in the district were carbon-copied on Chief Judge Lange's letter. Filing 1-5.

Kilgallon responded to Chief Judge Lange on the morning of May 10, 2021, carbon-copying Marshal Mosteller. Filing 1-6; Filing 1-9. He assured Chief Judge Lange that the USMS had been steadfast in its efforts to comply with Center for Disease Control ("CDC") guidance for mitigating COVID-19. Filing 1-6 at 1. Kilgallon confirmed that "[w]hile the Marshals Service strongly encourages our [Deputy U.S. Marshals] and all other employees to be vaccinated, we are not mandating it." Filing 1-6 at 2. Kilgallon also asserted that the USMS's position was consistent with other federal employers' at the time and specifically noted the guidance of the Administrative Office of the United States Courts, which according to him, encouraged but did not require employees to be vaccinated. Filing 1-6 at 2. He also confirmed that the USMS was not requiring its employees to inform its management of their vaccination status, and the USMS was "not inclined to direct our personnel to provide this information to the court or any other third party." Filing 1-6 at 3. Chief Judge Lange responded by thanking Kilgallon for his response, expressing his disappointment with USMS's position, and noting that he would discuss the matter with his fellow district judges on a scheduled call the following day. Filing 1-9.

### B. Judge Kornmann Orders a USMS Deputy to Leave His Courtroom

Later the same day as the exchange between Kilgallon and Chief Judge Lange, an offender under supervision who was in custody was brought into Judge Kornmann's courtroom by a Deputy U.S. Marshal, Kara Kinney, for a supervised-release revocation hearing. Filing 11-3 at 1-2. A USMS employee known as a Court Security Officer ("CSO") was also present in the courtroom. Filing 11-3 at 5-6. Shortly after Deputy Marshal Kinney brought the offender into the courtroom,

Judge Kornmann inquired as to whether or not she was vaccinated. Filing 11-3 at 4. Deputy Marshal Kinney refused to answer. Filing 11-3 at 4. Judge Kornmann ordered her to leave the courtroom and asked the CSO to stay with the prisoner. Filing 11-3 at 4-6.

Shortly after Judge Kornmann ordered Deputy Marshal Kinney to leave his courtroom, the U.S. Marshals on duty removed the other prisoners scheduled for hearings that day and the next from the courthouse. Filing 1-4 at 5-6. After the prisoners were removed, Judge Kornmann spoke with Chief Deputy Houghtaling on the record. Filing 1-4 at 3-4. Chief Deputy Houghtaling informed Judge Kornmann that USMS court-security policy required a deputy marshal, and not merely a CSO, to be in the courtroom with in-custody persons, and the CSO who had remained with the first prisoner after Deputy Marshal Kinney's departure was therefore not qualified to supervise the remaining prisoners during their hearings. Filing 1-4 at 5-6. Chief Deputy Houghtaling stated it was "the U.S. Marshal for the District . . . in consultation with our headquarters," who made the decision to remove the prisoners. Filing 1-4 at 6. He further explained that the USMS staff who were physically in Aberdeen at the time were unable to comply with the requirement they be vaccinated, leaving the USMS, in his view, unable to "safely move forward with court proceedings" and "without much of a choice." Filing 1-4 at 10. Judge Kornmann observed that there was a "direct confrontation between the U.S. Marshals Service and the Administrative Office [of the United States Courts], as well as all of the federal judges in South Dakota." Filing 1-4 at 7.

The remaining hearings were rescheduled via video-teleconference for later that same day. *See* Filing 1-4 at 13-16. Each of the prisoners participated via video conference from a room other than Judge Kornmann's courtroom in the Aberdeen courthouse so Deputy Marshals who were

unvaccinated or whose status was undisclosed would not need to enter Judge Kornmann's courtroom. *See* Filing 1-4 at 13-16.

### C. Judge Kornmann Holds Defendants in Contempt

In an order dated May 19, 2021, Judge Kornmann ordered the three defendants in this case to appear before him on June 14, 2021, and show cause why they should not be found in civil contempt. Filing 1 at 10. In this show-cause order, Judge Kornmann detailed the events of May 10, 2021, reiterated the Court's concerns about the COVID-19 pandemic, and expressed his displeasure with the USMS's handling of the situation. *See generally* Filing 1. He stated that "the recent actions of the United States Marshals Service personnel in court and in the courthouse constituted direct disobedience to court orders." Filing 1 at 8. He concluded the removal of the prisoners from the courthouse "interfered with the administration of justice" and "constituted both in-court contempt and out-of-court contempt interfering with judicial proceedings" that "caused each [prisoner] to be in violation of a court order to appear for the given hearing." Filing 1 at 8.

On June 11, 2021, Defendants filed a motion requesting a continuance of the civil-contempt hearing scheduled for June 14. Filing 12 at 1. In the motion, counsel for Defendants represented to the Court that he had been advised Judge Kornmann had spoken with USMS Director Donald Washington, and during that conversation, he had indicated this case might be one of criminal, rather than civil contempt. Filing 12 at 2. Later that day, Judge Kornmann issued an order denying the request for a continuance and informing Defendants that, due a variety of legal problems with charging civil contempt, "[t]he only solution is to charge the defendants with criminal contempt." Filing 14 at 1. He also explained that he had spoken with Director Washington twice. Filing 14 at 1-2. Judge Kornmann explained in his order that the purpose of his second call was "so that the defendants and their attorneys could have fair warning about criminal charges." Filing 14 at 2. He

8

also noted that he "told the Director that the matter could be finally resolved by each of the defendants apologizing, admitting their responsibility, and contributing $5,000 each to the fund maintained by the Clerk's office to compensate attorneys who are appointed in civil cases." The order finally indicated that the purpose of the June 14 hearing was to serve as official notice under Federal Rule of Criminal Procedure 42. Filing 14 at 3.

On June 14, 2021, Judge Kornmann held the scheduled hearing with Defendants, who were represented by attorneys from the Department of Justice's Civil Division, as they had not yet secured representation from criminal-defense attorneys. Filing 20 at 27-28. Judge Kornmann made a record of the background of the case and verbally placed the defendants on notice that they were charged with "conspiracy to obstruct justice, contempt of court, under 18 United States Code §401." Filing 20 at 30. Judge Kornmann also issued a written order the following day placing the defendants on notice of their alleged contempt of court under 18 U.S.C. § 401(1) and alternatively, under 18 U.S.C. § 401(3). Filing 21. Pursuant to Federal Rule of Criminal Procedure 42, Judge Kornmann gave the United States Attorney for the District of South Dakota until June 18, 2021, to notify him if the office would prosecute the case. Filing 21 at 2. On June 17, the acting United States Attorney for the District of South Dakota notified the Court that Associate Deputy Attorney General Bradley Weinsheimer had recused his office from the case and the matter had been assigned to the Department of Justice's Public Integrity Section pursuant to 28 U.S.C. § 515. Filing 26. The same day, an attorney from the Public Integrity Section notified the Court that the Department of Justice declined to prosecute the case. Filing 29. Accordingly, Judge Kornmann appointed a special prosecutor to the case. Filing 33.

On July 1, 2021, Chief Judge Lange entered an order recusing all district and magistrate judges in the District of South Dakota and referring the matter to the Chief Judge of the Eighth

Circuit Court of Appeals for designation of an out-of-district judge. Filing 34. Chief Judge Lange explained in his order that all district and magistrate judges of the District of South Dakota had advised that they would recuse themselves at a recent meeting, and he was entering his order to avoid the need for multiple separate orders. Filing 34 at 1. On July 7, 2021, Chief Judge Lavenski R. Smith of the Eighth Circuit Court of Appeals appointed the undersigned judge to preside over the present case pursuant to 28 U.S.C. § 292(b). Filing 35.

The Court held a hearing via video-teleconference with counsel for all parties on July 14, 2021. Filing 38. Pursuant to the matters discussed at the hearing, the Court issued a scheduling and case-management order on July 16, 2021. Filing 39. The Court set trial to begin on December 14, 2021, in Sioux Falls, South Dakota and set pretrial-motions deadlines for the parties. Filing 39. The Court also ruled that Defendants would not be subject to more than six months' imprisonment if convicted, rendering the charges petty offenses. Filing 39 at 5 (citing 18 U.S.C. § 3559(a)).

On August 20, 2021, Defendants filed a joint motion to dismiss the charges against them. Filing 45. Defendants argue the Court has the inherent authority to dismiss the contempt charges levied against them and ought to do so both because dismissal is in the interests of justice and because there is no probable cause that a crime has been committed. Filing 46 at 24-42. The prosecution argues the Court is without authority to dismiss the case because it would necessarily need to make factual determinations which are only appropriate for the fact-finder at trial. Filing 49 at 2-11. The prosecution further maintains that the interests of justice and the public require this case to proceed to trial. Filing 49 at 11-16.

## III.   DISCUSSION

This case involves the "exceptional case" of an open "dispute between the Marshals Service and a Federal District Court." *See, e.g., Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474

10

U.S. 34, 43 (1985) (Stevens, J., dissenting). Indeed, filings in this case reveal that nearly every party and the U.S. Department of Justice have conceded that although this a case in which three individuals are charged with a crime, the heart of the matter is a dispute between the USMS and the Court. *See, e.g.*, Filing 1 at 6 (Judge Kornmann's show-cause order stating "the question is whether the executive branch may adopt and maintain policies and procedures that severely interfere with the ability of the federal judiciary to run the courtrooms and chambers"); Filing 46 at 2-8 (Defendants describing the structure of the federal government and the USMS's position as an arm of the executive branch in their Motion to Dismiss); Filing 49 at 1-2 (the prosecution referring to "[t]he United States Marshals Service" as a whole rather than Defendants' individual actions in responding to Defendants' Motion to Dismiss); Filing 44 at 2 (the Department of Justice's Statement of Interest asserting "[t]hese proceedings arise out of an unprecedented rift between a federal judge and the U.S. Marshals Service").

Regardless of the underlying motivation of the parties, the Court's task is to determine whether three members of the United States Marshals Service should be tried for criminal contempt. Charges of criminal contempt are and should be a relatively rare. *See, e.g., In re Weeks*, 570 F.2d. 244, 247 (8th Cir. 1978) ("The power of contempt which a judge must have and exercise in . . . maintaining the authority and dignity of the court is most important and indispensable. But its exercise is a delicate one and care is needed . . . ." (quoting *Cooke v. United States*, 267 U.S. 517, 539 (1925)). The Court has no interest in and no occasion to attempt to settle any remaining dispute over the COVID-19-mitigation policies of the executive branch, the judiciary, or of entities within the branches. Rather, considering only the merits of the case at hand and the applicable law, the Court finds it has the authority to consider dismissal on the grounds asserted and finds dismissal of the charges is warranted in this case.

### A. The Court's Authority to Dismiss Criminal Charges

In briefing, the parties dispute whether the Court has the authority to entertain Defendants' Motion to Dismiss or whether only a trial can resolve the pending charges. Defendants argue that because the contempt charges at issue were brought under the Court's inherent authority to guard against rejections of judicial authority, the Court necessarily retains inherent authority to dismiss the charges before a trial on the merits. Filing 46 at 24-27. The prosecution argues that because this is a criminal case, Federal Rule of Criminal Procedure 12 governs the ability of the Court to dismiss the charges and restricts its authority to narrow circumstances not applicable here. Filing 49 at 2. However, at the hearing on this matter, the prosecution conceded that the Court did, in fact, retain inherent authority to dismiss criminal proceedings in the nature of contempt. The prosecution argues, however, that in order to dismiss the case, the Court would be forced to make factual findings that would invade the province of the finder of fact at trial, in contravention of binding precedent. Filing 49 at 2-3 ("Courts may not, however, make factual findings when an issue is inevitably bound up with evidence about the alleged offense itself." (quoting *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016)). The prosecution also notes that "there is 'no equivalent in criminal procedure to the motion for summary judgment that may be made in a civil case . . . the government has no duty to reveal all of its proof before trial.'" Filing 49 at 3 (quoting *United States v. Nabors*, 45 F.3d 238, 240 (8th Cir. 1995)). The Court examines the interplay between Rule 12 and the Court's inherent contempt authority.

### 1. Federal Rules of Criminal Procedure

The Court finds that Federal Rule of Criminal Procedure 12 does not prevent it from dismissing this matter.

"[C]riminal contempt is a crime in every fundamental respect." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968). As a criminal proceeding, the rules of criminal procedure would ordinarily apply; however, Federal Rule of Criminal Procedure 58(a)(2) provides, "[i]n a case involving a petty offense for which no sentence of imprisonment will be imposed, the court may follow any provision of these rules that is not inconsistent with this rule and that the court considers appropriate." As explained by Justice Kennedy, "Federal Rule of Criminal Procedure 58(a)(2) authorizes district courts not to apply the Federal Rules of Criminal Procedure in petty offense prosecutions for which no sentence of imprisonment will be imposed. The rules contemplate the determination being made before trial." *Lewis v. United States*, 518 U.S. 322, 338 (1996) (Kennedy, J., concurring) (citing Fed. R. Crim. P. 58(a)(3)); *see also United States v. Harper*, 946 F.2d 1373, 1374-75 (8th Cir. 1991) (holding that the Federal Rules of Criminal Procedure applied in a case in which only petty offenses were at issue because the district court failed to determine ahead of time "that, in the event of conviction, no sentence of imprisonment would actually be imposed"). The Court has already ruled that the offenses at issue would result in no more six months of imprisonment in the event of conviction. Filing 39 at 5. The Court has considered the matter further with the benefit of the additional briefs now before it. In addition, the Court remains mindful of Judge Kornmann's stated intent not to imprison Defendants. *See* Filing 14 at 1 ("I have had no intention to imprison the defendants but I do believe they should be punished."). Given the nature of the conduct at issue, the Court now rules that a sentence of imprisonment would not be considered in this case in the event of conviction. Thus, while the Court intends to abide by the Federal Rules of Criminal Procedure in this matter, strict adherence is now a matter of discretion for the Court. *See* Fed. R. Crim. P. 58(a)(2).

Federal Rule of Criminal Procedure 12(b)(1) provides, "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." As the Eighth Circuit has determined, "A motion is capable of pretrial determination 'if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity' of the motion." *Turner*, 842 F.3d at 604-05 (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)). Further, the Court is permitted to consider matters outside the pleadings when ruling on such a motion. *Id.* at 605 ("Courts may consider evidence beyond the pleadings to make factual findings in pretrial orders." (citing *United States v. Bloomfield*, 40 F.3d 910, 913–15 (8th Cir. 1994))); *see also United States v. Lafferty*, 608 F. Supp. 2d 1131, 1137 (D.S.D. 2009) ("[I]t is permissible, and even desirable in certain circumstances, for a court to consider evidence in connection with a pretrial motion to dismiss, particularly where the operative facts are undisputed and not objected to, in order to ascertain whether the elements of the criminal charge can be established."); *United States v. Marrowbone*, No. 3:14–CR–30071–RAL, 2014 WL 6694781, at *2 (D.S.D. Nov. 26, 2014) ("[I]n certain circumstances, such as when operative facts are undisputed, it is permissible for a court to consider evidence in connection with a pretrial motion to dismiss.").

Here, the motion to dismiss is capable of resolution without a trial because the operative facts needed to assess whether USMS personnel could comply with Judge Kornmann's scheduling orders, his in-court direction to Deputy Marshal Kinney, and USMS security policy are undisputed. In particular, there are transcripts of Judge Kornmann's interaction with Deputy Marshal Kinney and his phone call with Chief Deputy Houghtaling, and the USMS policy at issue is published in a USMS policy directive. Filing 11-3 (transcript); Filing 11-4 (policy directive). As to whether USMS personnel acting pursuant to executive branch policy issued pursuant to statute can be held

14

in contempt for doing so, that is a pure question of law fit for resolution by the Court on a pretrial motion. Thus, Federal Rule of Criminal Procedure 12, in addition to not being mandatory due to the petty nature of the charges, does not prevent the Court from ruling on Defendants' Motion to Dismiss.

### 2. The Court's Contempt Power and the Ability to Consider the Interests of Justice

Having concluded the Federal Rules of Criminal Procedure do not preclude the possibility of dismissal, the Court examines whether it has the authority to dismiss contempt charges it previously brought. It has long been understood that "[t]he power to punish for contempt inheres in all courts. Such proceedings are sui generis . . . ." *Conley v. United States*, 59 F.2d 929, 935 (8th Cir. 1932); *see also Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 793 (1987) ("[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders . . . ."). "[T]he contempt power [is a matter of] necessity: Courts independently must be vested with 'power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates . . . .'" *Int'l Union United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821)). Contempt, however, must be exercised with "the least possible power adequate to the end proposed." *Lindsey v. Ipock*, 732 F.2d 619, 625 (8th Cir. 1984) (quoting *Marshall v. Gordon*, 243 U.S. 521, 541 (1917)).

The Eighth Circuit has not addressed whether this "least possible power adequate to the end proposed," *id.*, permits the Court to dismiss contempt charges when it becomes apparent the interests of justice or the public favor doing so. However, at least two other circuit courts have found the court which initiates contempt proceedings has the ability to dismiss them when it perceives the need to vindicate its authority through punishment has abated. *See In re Dellinger*,

502 F.2d 813, 817 (7th Cir. 1974) ("We see no reason why the judge must dismiss to achieve [no punishment], though that option is open at least to the court which initiated the contempt proceedings."); *United States v. Barnett*, 346 F.2d 99, 100 (5th Cir. 1965) ("Criminal contempt is a sui generis proceeding for the protection of the integrity of the Court . . . Those proceedings are, therefore, within the control of the Court and the Court has the power and authority to order them dismissed."); *see also United States v. Kelsey-Hayes Co.*, 476 F.2d 265, 266 (6th Cir. 1973) (holding a district court's order dismissing contempt charges was not an appealable order where the lower court had considered facts and evidence outside the pleadings); 3A Fed. Prac. & Proc. Crim. § 709 (4th ed. April 2021 update) (citing *Barnett*, 346 F.2d 99, for the proposition that a court has the authority to sua sponte dismiss contempt proceedings before trial).

At the hearing on this matter, the prosecution conceded it had located no contrary caselaw and agreed that the Court retained inherent authority to dismiss contempt proceedings. Further, in a typical criminal case, the entity initiating the charges, the executive-branch prosecutor, generally retains the ability to dismiss charges with minimal interference or required justification. Fed. R. Crim. P. 48(a) ("The government may, with leave of court, dismiss an indictment, information, or complaint."). The Court sees no reason why the same principle ought not to apply when a court initiates criminal charges itself. Thus, the Court is persuaded that it may dismiss charges of criminal contempt it previously brought if it is satisfied that punishment is unnecessary to vindicate the Court's authority and the interests of justice or the public would be best served by dismissal.

### B. Grounds for Dismissal

Having determined it has the authority to dismiss the contempt charges in this case, the Court turns to the merits of the Motion to Dismiss.

Defendants' arguments in favor of dismissal can be broadly summarized as fitting into one of three categories. First, Defendants argue that the exceptional nature of this case, involving a conflict between two branches of government, counsels in favor of dismissal in the interests of justice and the public. Filing 46 at 28-32. Next, the defense argues the prosecution will not be able to demonstrate Defendants fulfilled the elements of criminal contempt under 18 U.S.C. § 401(1) and (3). Filing 46 at 32-38. Finally, Defendants argue that under binding precedent, executive-branch officials who act pursuant to agency orders promulgated under statutory authority cannot be held in contempt when compliance with the agency order causes noncompliance with an order of the court. Filing 46 at 39-40.

The prosecution argues the interests of justice and the public and the need for the court to vindicate its authority require a trial in this matter. Filing 49 at 11-12. Further, the prosecution asserts Defendants overstate the statutory authority of the USMS, and removing prisoners scheduled for hearings without the Court's knowledge constitutes "a flagrant display of disrespect and disobedience" and significant subversion of the Court's authority. Filing 49 at 13-15.

Defendants' arguments that the prosecution is unlikely to be able to prove each element of the offenses charged beyond a reasonable doubt at trial are not without merit. However, they are largely inappropriate at this stage of the proceedings. It is not the Court's place to guess ahead of trial what evidence the prosecution may present and to make factual findings "inevitably bound up with evidence about the alleged offense itself" when issues of fact may be in dispute. *Turner*, 842 F.3d at 605. Such assessments are committed to the finder of fact at a trial. *See id.* Thus, the Court will not directly address the Defendants' arguments that the prosecution cannot prove sufficient proximity to the court to fulfill the elements of misbehavior and criminal intent as required by 18 U.S.C. § 401(1) and (3). However, Defendants' remaining arguments are well-founded.

First, their argument that compliance with established executive branch policy at the expense of noncompliance with a court's order does not result in contempt under the law is a legal question that can be answered with reference to largely undisputed facts. Similarly, the Court can assess the balance of interests of justice and the public, an argument which both Defendants and the prosecution claim supports their side, without usurping the role of the fact finder at trial. In considering these matters in turn, the Court agrees with Defendants that under the specific and highly unique circumstances of this case, United States Supreme Court precedent indicates contempt charges are not an appropriate remedy. The Court also finds the interests at stake favor dismissal of the charges.

*1. Noncompliance with Court Orders Pursuant to Executive Branch Policy*

As noted by the prosecution, "the USMS has contributed to the judiciary's efficient operations and ensured that the courts function smoothly," for more than 200 years. Filing 49 at 15. Indeed, the judiciary and the USMS share a special relationship. Though they regularly work side-by-side with the judiciary, it has long been beyond dispute that U.S. Marshals are executive-branch officials. *Penn. Bureau of Correction*, 474 U.S. at 36 n.1 ("Marshals are within the Executive Branch of the Federal Government . . . subject to the supervision and direction of the Attorney General . . . ."); *In re Neagle*, 135 U.S. 1, 63 (1890) ("[M]arshals of the United States . . . belong emphatically to the executive department of the government"). The primary mission of the USMS is "to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law." 28 U.S.C. § 566(a). The USMS is statutorily required to "consult with the Judicial Conference of the United States on a continuing basis regarding the security requirements for the judicial branch . . . to ensure that the views of the

Judicial Conference regarding the security requirements . . . are taken into account . . . ." 28 U.S.C. § 566(i). Congress was clear in its statutory language, however, that "[t]he United States Marshals Service retains final authority regarding security requirements for the judicial branch of the Federal Government." 28 U.S.C. § 566(i).

In general, one cannot "make himself a judge of the validity of [court] orders which have been issued, and by his own act of disobedience set them aside." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911). As the Supreme Court has instructed, to allow a party to do so would render "the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery." *Id.* However, the Supreme Court has also found limits on the contempt power where a subordinate executive branch official violates a court order on the grounds that the official is prohibited from complying by his superior through valid orders issued pursuant to statutory command. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 467-68 (1951).

In *Touhy*, a Federal Bureau of Investigation ("FBI") agent was found in contempt after being subpoenaed to produce documents and refusing on the basis of an order of the Attorney General that prohibited him from disclosing the subpoenaed documents. 340 U.S. at 464-65. The Attorney General's order was issued pursuant to a statute authorizing him to issue such an order. *Id.* at 468. The Seventh Circuit observed that "courts have no jurisdiction or power to punish executive officers or employees for obeying the orders or instructions of their superiors in adhering to regulations promulgated pursuant to statutory authority" and reversed the district court. *United States ex rel. Touhy v. Ragen*, 180 F.2d 321, 324 (7th Cir. 1950). The Supreme Court affirmed, stating, "We think [the order prohibiting disclosure] is valid and that [the FBI agent] in this case

properly refused to produce [the papers that were the subject of the court's order]." *Touhy,* 340 U.S. at 468.

*Touhy* and its progeny deal expressly with issues of non-disclosure of requested documents rather than with the removal of prisoners from a courthouse ahead of a scheduled hearing. *See* 340 U.S. 462. However, the underlying principles and the reasoning in support thereof are equally as applicable in the case at hand. Judge Kornmann ordered Deputy Marshal Kinney to leave a defendant who was in custody in his courtroom because she would not comply with the Court's policy requiring disclosure of vaccination status. Filing 11-3 at 4-5. However, pursuant to USMS policy directives on the matter of judicial security, an "in-custody person, who must be physically present in the courtroom during any proceeding, will be escorted by at least two operational personnel" and "a minimum of one [Deputy United States Marshal] must be present to provide judicial and courtroom security." Filing 11-4 at 3 (USMS Policy Directive 10.2). Given Judge Kornmann's order and USMS staffing present in Aberdeen, it was impossible for USMS personnel to comply with the order given to Deputy Kinney, the court's scheduling orders, and USMS security policy at the same time. The Court notes that the USMS had advanced notice that the Court expected the marshals present in courtrooms to be vaccinated and that the Court would be inquiring about the marshals' vaccination statuses. Regardless of this advance notice and the fact that such a conflict could have therefore been avoided, however, at the time when the USMS was subjected to conflicting orders from the Court and its own well-established security policy, it was impossible for it to fully comply with both. When an executive branch official is unable to comply with a court order because of validly promulgated agency rules supported by statutory authority, they cannot be held in contempt for their failure to comply. *See Touhy,* 340 U.S. at 467-68.

The Court notes once again that this case presents a unique situation. It must be stressed that the security policy at issue here, requiring a full-fledged Deputy United States Marshal in the courtroom, was an established USMS policy promulgated pursuant to its statutory duty to provide for judicial security well ahead of the events of May 10, 2021. *See* Filing 11-4; 28 U.S.C. § 566(i). Thus, it is clear from the undisputed evidence submitted outside the pleadings in this case that this is not a post-hoc rationalization for misbehavior but a longstanding and well-reasoned policy in place to allow the USMS to carry out its statutory obligation. USMS personnel could not comply with all of the orders they were subject to and opted to ensure compliance with those from the executive branch. The events of the day made clear that so long as the prisoners remained in the courthouse, USMS personnel would be expected and ordered by the court to violate statutorily promulgated executive branch rules. The USMS has the "final authority regarding security requirements for the judicial branch of the Federal Government," 28 U.S.C. § 566(i), and has determined that the presence of a U.S. Marshal in the courtroom is required to ensure safety. Thus, causing the prisoners to be removed was not contemptuous in the legal sense. No one is "beyond the reach of the law," *Young*, 481 U.S. at 796 n.8, not even senior leadership of the USMS, but in this highly unique situation, and in light of what Defendants are alleged to have done, the law is on their side.

That is not to say the USMS is without fault here. While securing prisoners is undoubtedly a critical task in ensuring court security, the USMS's actions demonstrate it did not hold a similar high regard for the health and safety of Court participants when it came to the COVID-19 pandemic. Additionally, while the Court went to great lengths to make its concerns about COVID-19 and its policy regarding vaccination and vaccination-status disclosure well-known, it appears the USMS did not return the courtesy of preparing in advance to avoid conflict and strife. The

incident in Judge Kornmann's courtroom on May 10 could have and should have been averted had the USMS been more proactive, cooperative, and communicative with the Court. Nevertheless, despite the impropriety of the USMS in this regard, the actions specifically attributable to the named defendants in this case cannot be said to constitute contempt of court such as should subject them to criminal penalties. Dismissal of the criminal charges against the defendants is warranted.

### 2. The Interests of Justice and the Public

Even assuming what Defendants are accused of could be construed as criminal contempt in this situation, the Court finds it is in the interests of justice and the public to dismiss the charges. The Court sees "no sufficient reasons . . . for the further prosecution" of the public servants currently standing accused. *See Barnett*, 346 F.2d at 100. In *Barnett*, the Fifth Circuit cited substantial compliance with its subsequent orders and the lack of need for further deterrence as the likelihood of a similar issue arising was low given changes in circumstances. 346 F.2d at 100-01. The Court finds a similar situation before it here.

As an initial matter, on September 9, 2021, President Biden issued an executive order mandating vaccination for all federal employees. Exec. Order No. 14043, 86 FR 50989 (Sept. 14, 2021). Thus, any issues with unvaccinated USMS personnel being in the courtroom should soon become a thing of the past, and much of the underlying COVID-19 policy dispute that led to this matter has been resolved. Further, there is no suggestion that the USMS has failed to comply with any of the District of South Dakota's subsequent orders regarding the pandemic. *See, e.g.*, Standing Order 21-07 N (Judge Kornmann's order that unvaccinated personnel and personnel whose vaccination status is unknown must wear N-95 masks or double mask issued May 26, 2021). Finally, as a result of this case, the contours of the USMS security requirements should be well understood by all involved, which will allow personnel from each branch to work towards

solutions that are mutually satisfactory. The likelihood of a situation like this one occurring again is low.

Additionally, the Court feels obligated to consider what, by all accounts, is really going on here: a policy dispute between two branches of government. *See, e.g.*, Filing 1 at 6; Filing 46 at 2-8; Filing 49 at 1-2; Filing 44 at 2. As prudently noted by Justice Stevens, "there are a variety of mechanisms that should be used before the marshals and the courts engage in judicial combat." *Penn. Bureau of Correction*, 474 U.S. at 51 (Stevens, J., dissenting). Clearly, some of those "mechanisms" were skipped here. Given the concession by all involved that the conflicting desires and policies of the USMS and the Court regarding COVID-19 and court security precipitated the events in this case, it is wholly unjust to place the blame solely on these named defendants by trying them for contempt. Further, the public is best served by the Court and the USMS attempting to resolve their differences through the mechanisms available to them short of contempt proceedings.

### C. The Motion to Amend the Case Caption

On August 18, 2021, the Department of Justice filed a motion asking the Court to recaption the case "as 'In Re: Contempt' because the United States has declined to prosecute this matter and expects to file a brief in support of the dismissal of the criminal defendants." Filing 40 at 1. The prosecution opposed the motion, arguing there is no confusion and noting that as special prosecutor it is a representative of the United States. Filing 42. The Court concludes the motion to recaption the case should be denied.

It is well established that, "[p]rivate attorneys appointed to prosecute a criminal contempt action represent the United States, not the party that is the beneficiary of the court order allegedly violated." *Young*, 487 U.S. at 804. Criminal contempt proceedings are "between the public and the

defendant." *Gompers*, 221 U.S. at 445. Given that, and the lack of apparent confusion present, the Court sees no reason this case should be recaptioned. The prosecution in this case is charged with representing the United States, and the case is captioned accordingly.

### D. Motion for Subpoenas

Lastly, the prosecution has filed a second motion seeking to subpoena certain documents from Verizon. Filing 63. Because the Court concludes the case must be dismissed, the prosecution's subpoena motion is denied as moot.

### IV.   CONCLUSION

For the reasons stated above,

IT IS ORDERED:

1. Defendants' Motion to Dismiss, Filing 45, is granted;

2. The Department of Justice's motion to recaption the case, Filing 40, is denied;

3. The prosecution's Second Motion For Issuance Of Subpoena Duces Tecum Pursuant To Rule 17(c), Filing 63, is denied as moot;

4. The charges against Defendants are dismissed;

5. The trial scheduled in this matter is canceled;

6. This case is closed; and

7. The Court will enter a separate judgment

Dated this 10th day of November, 2021.

BY THE COURT:

Brian C. Buescher
United States District Judge